# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>ex rel. BRADLEY KELLER | ) <br> ) <br> ) | |
| Plaintiff-Relator, | ) <br> ) | Case No. ___20-CV-100-LTS-MAR___ |
| v. | ) <br> ) | **JURY TRIAL DEMANDED**<br>**FILED UNDER SEAL** |
| WDC ACQUISITIONS, LLC D/B/A<br>WELLMAN DYNAMICS and<br>TRIVE CAPITAL MANAGEMENT LLC, | ) <br> ) <br> ) <br> ) | |
| Defendants. | ) | |

## COMPLAINT

1.      Relator Bradley Keller brings this action on behalf of himself and the United States of America against Defendants WDC Acquisitions, LLC d/b/a Wellman Dynamics ("Wellman") and Trive Capital Management LLC ("Trive"), for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331, 1345.

3.      Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a), as Defendants transact business in this jurisdiction.

## PARTIES

4.      Defendant WDC Acquisitions, LLC, d/b/a/ Wellman Dynamics is a limited liability company headquartered at 1746 Commerce Road, Creston, Iowa 50801, that specializes in manufacturing large scale, complex magnesium and aluminum castings for military and commercial aerospace markets and other industrial segments.

5.      Wellman's castings are sold to original equipment manufacturers (OEMs), who use the parts for military and commercial helicopters, jet engines, rockets, and missile systems.

6.      Wellman customers include, among others, Boeing Rotorcraft Systems, Bell Textron, Sikorsky Aircraft, Raytheon Missiles & Defense, and Aerojet Rocketdyne. Its products may be found in the Blackhawk, Apache, Viper, Venom, Osprey, King Stallion, and Marine One helicopters, among others.

7.      Wellman employs about 400 people in its 225,000 square foot manufacturing facility.

8.      Wellman maintains ISO 9001:2015 and AS9100:2016 certifications, as well as National Aerospace and Defense Contractors Accreditation Program ("NADCAP") certification for Materials Testing, Heat Treating, Non-Destructive Testing, and Welding.

Case 1:20-cv-00100-LTS-MAR   Document 1   Filed 10/09/20   Page 2 of 29

9.     Trive Capital Management LLC is a Dallas, Texas based private equity firm that, through its affiliate WDC Acquisition, acquired Wellman's assets in May 2018.

10.     Trive manages approximately $2 billion in aggregate capital commitments.

11.     Relator Bradley Keller worked as a Technician for Wellman in its Quality Control Department from 2011 through 2020.

12.     In fall 2015, he transferred from the X-Ray Department to the Metallurgical Laboratory ("Met Lab"), where his job duties included Chemistry Testing, Environmental Testing, Microstructure Analysis, Tensile Testing of Representative Test Specimens for Quality Assurance of Production Castings, Destructive Testing of Developmental Castings for First Article Acceptance, and Destructive Testing of Production Castings for Production Quality Control Verification.

13.     Relator Keller was laid off in August 2020 after twice reporting his immediate supervisor for falsifying test data.

## FACTUAL ALLEGATIONS

### Improper Tensile Testing

14.     For each casting that is produced for a customer, tensile test specimens, also called "test bars" are produced. These test bars are created

either as a piece of the casting that can be easily removed or as a separate cast bar poured from the same pot of metal as the casting it represents.

15.     Once the product casting is ready to ship, the test bars are tested under strictly controlled parameters, using the Tinius Olsen "Super L" machine for tensile testing.

16.     The first step in tensile testing is for the Test Operator to measure the diameter of the reduced section in three locations (smallest, largest, and approximate middle) across the center of the bar and record the results on Form ISO-LAB-64, "Separately-Cast Dimensional Log."

17.     Based on these measurements, the average diameter is computed and entered into the tensile test program.

18.     The Super L machine then stretches the test bar until it breaks.

19.     Once the test has finished, the Super L machine calculates (a) the point at which the test bar yields; (b) the point at which the test bar breaks; and (c) how much force it took to cause the test bar to break.

20.     The Test Operator then measures total elongation (i.e., how much the bar stretched) as a percentage greater than the original amount, using scribe markings and a vernier caliper.

21.     All of these measurements are used to determine whether or not the casting passed tensile testing and meets customer requirements.

22.     If the test bar fails to meet customer requirements, the Test Operator should first examine the failed test bar to see whether there is an obvious defect that would account for the failure, such as inclusions.

23.     If such a visible flaw is found, the Test Operator may replace it with another bar from the same family and re-test.

24.     If no visible defects are observed, then the Test Operator is required to use two replacement bars, and **both** must meet acceptable limits in order for that lot of production castings to be approved for release.

25.     However, on many occasions Relator was instructed by the Wellman Lab Manager, Jack Arms, as well as Arms's superior, the Chief Metallurgist, to simply pull another test bar from the same family of bars, and to keep doing so until he was able to find a single test bar from the pour that met the required properties.

26.     At times, relator went through as many as seven failing test bars before finding one that would pass the test. However, so long as one bar could be found to pass the test, the lot was considered acceptable and sent to the customer.

27.     Relator was instructed to remove these failing results from the daily summary that is printed and stored after all production testing is completed.

28.    However, as his knowledge of proper methodology increased, Relator became concerned about not recording this information and began to keep the failing results on the daily summary.

29.    He also started recording test failures on the ISO-HET-01 "Request for Heat Treat Release" form as a secondary record of test failures.

**Falsifying Tensile Properties**

30.    In September 2019, Relator discovered that while he had been temporarily assigned to another area, the Lab Manager had manipulated test results from the Super L machine by lowering the average diameter of the test bar after the test had been conducted.

31.    Lowering the diameter of the bar caused the Super L machine to recalculate the failing test properties with a proportionately higher value – one that would meet customer requirements and allow the production casting to be shipped.

32.    This discovery occurred because Wellman had recently implemented an automatic process that exported testing data for the day to an Excel spreadsheet format, with the intention that it could be used to better track quality trends in both daily production and the destructive testing programs.

33.    Relator was reviewing this data in the days immediately after the new process was implemented in order to verify that the data that was exported

matched the data that was logged, to ensure that the process was working correctly.

34.     Relator immediately reported his concern internally and although the discrepancies were confirmed, Wellman management determined that it had been done "in error" and there were no consequences for the Lab Manager.

35.     About eight months later, on May 19, 2020, Relator was testing separately cast test bars from a partial lot of castings that had been reworked but still failing to meet property requirements.

36.     While investigating these failures, Relator discovered that while he was on vacation during the week of March 16-20, 2020 that the Lab Manager had *again* falsified test data.

37.     Relator again brought this falsification to management and this time Arms was removed from the Met Lab—by being promoted to the Quality Engineering Department.

38.     In investigating what had occurred, Relator discovered that one lot of production castings for the Sikorsky UH-60 Black Hawk had shipped based on falsified data.

39.     It was decided by the Wellman quality team to destructively test one of the remaining castings from the partial lot by excising test bars from the casting itself, following the same procedure from when that part was in development.

40.     When Relator examined the actual reports, he saw four specimens from that casting had been tested, and all four had failed to meet requirements.

41.     Relator was told that the castings were going to be recalled, but he was not able to confirm that this occurred.

42.     No further destructive testing of castings from outside of that lot were performed to determine whether there had been a systemic problem with that particular part that would affect other batches outside of the known-bad lot.

**Fraudulent Destructive Testing**

43.     When a casting is in development, Wellman engineers work in coordination with the customer's engineering team to develop a plan to perform destructive testing on each casting.

44.     The resulting destructive test program specifies which areas must be excised and tensile-tested, which areas are deemed flight critical and held to a higher standard of requirements than other areas, and any other work that must be done to satisfy the customer's needs.

45.     The issue described with destructive testing applies to every product that required a destructive test program, which includes most military products.

46.     In destructive testing, every *nth* casting from a product line (a number set by contract; for instance, every twenty-fifth casting,) is removed and

submitted for destructive testing. Test specimens are excised from the casting, which destroys the casting, hence the title destructive testing.

47.     Because the testing destroys the casting that is tested, customers who require destructive testing pay extra, depending on how frequently they want a casting removed from production and tested.

48.     The reason for testing these areas is to revalidate that the product does not harbor any hidden metallurgical flaws.

49.     There are two types of test specimens that are excised for destructive testing: flat specimens and round specimens. Round specimens are like a rod, machined from the casting, and so must come from a thicker part of the casting. Flat specimens, however, are like slices of the casting and can be much thinner.

50.     In some instances, where parts of the casting are already thin, it is necessary to use a flat specimen because there is not enough material available at the critical spot to take a round specimen. In other words, flat specimens are often necessary in order to test the thin-walled areas of castings that had been identified by the customer as requiring testing, because obtaining a "round" specimen requires thicker material than the target area could provide.

51. From 2016 to 2019, Wellman was not certified for machining flat specimens, because the facility lacked the capability to produce them with the required precision.

52. Accordingly, Wellman had the option to either deviate from the destructive testing plan (with customer's knowledge and approval) or send out those bars that required flat specimen testing to another facility with the capability to perform the work.

53. Officially, after the decertification in 2016, test bars that required flat specimens were being sent out to Westmoreland Mechanical Testing & Research for testing. The reality, however, was very different and increasingly suboptimal.

54. In some such instances (where the area was too thin to extract a round specimen), the Lab Manager would simply direct Wellman lab techs like Relator to test an area *adjacent* to the thin-walled areas as a substitute, bargaining that there was not sufficient variation from one area to another to make any difference.

55. This deviation was not disclosed to or approved by the customers.

56. In other instances, and more concerningly, Wellman would just omit that area from testing entirely.

57.     Falsified information would then be inserted into the metallurgical reports for those castings for the areas that could not be tested by round specimen. In other words, the Lab Manager would just make up results.

58.     This is extremely concerning since these areas would have been the thinner—and logically, weaker—areas of the castings.

59.     In addition, because some castings were composed entirely of flat bars, they were simply set aside and hidden by the Lab Manager—allowing an untold number of production castings to go to the customers unchecked for hidden flaws.

60.     Relator discovered this complete fabrication of test results in or about July 2020, after Jack Arms had been removed from the Met Lab for frauding up tensile test results for the second time.

61.     Mick Hagen replaced Arms and observed that although the metallurgical reports purported to provide the results of testing for these areas, the underlying data was missing.

62.     Believing that the missing data simply had not been copied over after it arrived from the other facility, Hagen sent Relator to find those remnants, at which time Relator discovered they did not exist.

63.     Relator then questioned the Wellman machinist, who confirmed that no testing had been done on those parts.

64.     For example, parts ordered by Bell (believed to be for Helicopter UH-1Y & AH-1Z), Part No. 449-040-410-103C, Serial Nos. 467, 525, 542, 597, 633, 659, 688, 707, and possibly 757 were not tested properly. Specifically, areas were omitted as follows:

| Serial No. | Testing Date | Issue |
|---|---|---|
| 467 | 5/28/2015 | Did not test Areas TB1, TB2, TB3, or TB4 |
| 525 | 9/3/2015 | No testing data for this casting |
| 542 | 10/7/2015 | Did not test Areas T6, TB1, TB2, TB3, TB4, TC3, or TC4 |
| 597 | 5/9/2017 | Did not test Areas T1, T2, T3, T5C, T6, T7C, T8, or T9 |
| 633 | 11/15/2017 | Did not test Areas T1, T2, T3, T5C, T6, T7C, T8, or T9 |
| 659 | 2/5/2019 | Did not test Areas T1, T2, T3,T5C, T6, T7C, T8, or T9 |
| 688 | 8/2/2019 | Did not test Areas T1,T2, T3, T6, T7C, T8, or T9 |
| 707 | 2/4/2020 | Did not test Areas T1, T2, T3, T6, T7C, T8, or T9 |
| 757 | 7/7/2020 | Testing on this casting had not been completed at Relator's termination |

65.     Another example, also for Bell, (believed to be for Helicopter UH-1Y & AH-1Z), Part No. 449-040-051-101C, testing was flawed as follows:

| Serial No. | Testing Date | Issue |
|---|---|---|
| 404 | 12/18/2015 | No test data for area T4 |
| 422 | 8/8/2016 | No test data for appendage 2; test areas T10, T11, T12 tested as .252 round, not .252 flat |
| 451 | 1/12/2017 | Test areas T10, T11, T12 tested as .252 round, not .252 flat |
| 502 | 5/23/2017 | Areas T10, T11, T12 tested as .252 round, not .252 flat |

| Serial No. | Testing Date | Issue |
|---|---|---|
| 548 | 9/28/2017 | Test areas T10, T11, T12 tested as .252 round, not .252 flat |
| 571 | 6/8/2018 | Test areas T10, T11, T12 tested as .252 round, not .252 flat |
| 597 | 10/30/2018 | Test areas T10, T11, T12 tested as .252 round, not .252 flat |
| 650 | 3/27/2019 | Did not test areas T10, T11, T12 |
| 683 | 6/4/2019 | Did not test areas T10, T11, T12 |
| 719 | 12/5/2019 | Test areas T10, T11, T12 tested as .252 round, not .252 flat |
| 734 | 3/26/2020 | Did not do 2 bar retest - only a single bar retest for failures in areas T5, T6, T9; test areas T10,T11,T12 tested as .252 round, not .252 flat |
| 778 | 8/7/2020 | Testing on this casting had not been completed at Relator's termination |

66. Another example, also for Bell, (believed to be for Helicopter UH-1Y & AH-1Z), Part No. 449-040-053-103C, testing was flawed as follows:

| Serial No | Testing Date | Issue |
|---|---|---|
| 581 | 3/21/2018 | Did not test appendage bar 3; test areas T35C, T36C tested as .252 round instead of .505 round |
| 609 | 1/30/2019 | Test area T35C, T36C tested as .252 round instead of .505 round |
| 636 | 9/12/2019 | Test areas T18C, T25C, T27C failed repeatedly, investigation squashed and covered up; test areas T35C, T36C tested as .252 round instead of .505 round |
| 496 | 10/4/2016 | Did not test appendage bar 3 |
| 520 | 4/4/2017 | No test data for test area T31 |
| 546 | 11/2/2017 | Did not test appendage bar 2; test areas T35C, T36C tested as .252 round instead of .505 round |

Case 1:20-cv-00100-LTS-MAR   Document 1   Filed 10/09/20   Page 13 of 29

| Serial No | Testing Date | Issue |
|---|---|---|
| 657 | 10/7/2019 | Test areas T25C, T31 failed repeatedly, retests not performed on T31; test areas T35C, T36C were not tested at all |
| 691 | 2/19/2020 | Did not test appendage bar 3; test areas T35C, T36C tested as .252 round instead of .505 round |

67. Another example, ordered for Boeing for the AH-64E Apache, Part No. 7-511315010-005, testing was flawed as follows:

| Serial No. | Testing Date | Issue |
|---|---|---|
| 1027 | 7/1/2015 | Missing test data for appendages TB2, TB3 |
| 1054 | 9/2/2015 | Missing test data for appendages TB2, TB3 |
| 1099 | 12/22/2015 | Missing test data for appendages TB2, TB3 |
| 1145 | 5/17/2016 | Missing test data for appendages TB2, TB3 |
| 1198 | 9/21/2016 | Missing test data for appendages TB2, TB3 |
| 1246 | 12/20/2016 | Did not test appendages TB3, TB4; most likely falsified test data appendages TB3, TB4 |
| 1291 | 9/21/2017 | Missing test data for appendages TB2, TB3. At this point contract changed where the company didn't get paid extra for DT testing, would explain why no further MET reports were made. |
| 1343 | 2/12/2018 | Missing test data for appendages TB2, TB3; missing metallurgical report |
| 1395 | 5/31/2018 | Missing test data for appendages TB2, TB3; missing metallurgical report |

| Serial No. | Testing Date | Issue |
|---|---|---|
| 1442 | 8/9/2018 | Did not test appendages TB1, TB2, TB3, TB4; missing metallurgical report |
| 1487 | 2/21/2019 | Missing test data for appendages TB2, TB3; missing metallurgical report |
| 1532 | 8/29/2019 | Didn't test appendages TB1, TB2, TB3, TB4; missing metallurgical report |
| 1584 | 6/19/2020 | Testing on this casting had not been completed at Relator's termination |

68.     Another example, ordered for Boeing for the AH-64E Apache, Part No.

7-511315012-001, testing was flawed as follows:

| Serial No | Testing Date | Issue |
|---|---|---|
| 0033 | 5/12/2015 | Did not test appendage TB3 |
| 0058 | 6/22/2015 | Did not test appendage TB3 |
| 0078 | 8/4/2015 | Did not test appendage TB3 |
| 0139 | 4/4/2016 | Did not test appendage TB3 |
| 0167 | 8/27/2015 | No test data for this casting |
| 0186 | 6/2/2016 | Test area 7 tested as .252 round and not .252 flat |
| 0287 | 8/30/2016 | Did not test appendage TB3 |
| 0336 | 9/27/2016 | Did not test appendage TB3 |
| 0382 | 12/9/2016 | Did not test appendage TB3 |
| 0433 | 1/2/2017 | Did not test appendage TB3 & areas 3 & 7 |
| 0483 | 4/11/2018 | Did not test appendages TB1, TB2, TB3 & areas 3, 4 & 6 |
| 0530 | 6/22/2018 | Test area 7 tested as .252 round and not .252 flat; did not test appendage TB3 |
| 0588 | 9/13/2018 | Test area 7 tested as .252 round and not .252 flat; did not test appendages TB1, TB2, TB3 |
| 0635 | 1/1/2019 | Did not test appendages TB2, TB3 & areas 4, 5, 7 |

| Serial No | Testing Date | Issue |
|---|---|---|
| 0688 | 8/2/2019 | Test area 7 tested as .252 round and not .252 flat; did not test appendages TB2, TB3 |
| 0736 | 11/4/2019 | Did not test appendage TB3 & areas 4, 5, 7 |
| 0785 | 3/10/2020 | Testing on this casting had not been completed at Relator's termination |
| 0836 | 8/1/2020 | Testing on this casting had not been completed at Relator's termination |

69. Another example, ordered for Boeing for the AH-64E Apache, Part No.

7-511315020-001, testing was flawed as follows:

| Serial No | Testing Date | Issue |
|---|---|---|
| 0032 | 5/8/2015 | No record of testing appendage TB1 |
| 0053 | 6/22/2015 | No record of testing appendage TB1 |
| 0558 | 7/3/2019 | Did not test appendages TB2, TB3 & areas 3, 7 |
| 0608 | 2/4/2020 | Did not test areas 3 & 7 |
| 0656 | 7/14/2020 | Testing on this casting had not been completed at Relator's termination |
| 106 | 9/11/2015 | No record of testing appendage TB1 |
| 158 | 2/18/2016 | No record of testing appendage TB1 |
| 207 | 5/24/2016 | Test areas 3 & 7 were tested as .252 round not .252 flat; no record of testing appendage TB1 |
| 256 | 7/27/2016 | No record of testing appendage TB1 |
| 303 | 11/29/2017 | Did not test appendage TB1 & test area 3; test area 7 tested as .252 round, not flat |
| 350 | 2/14/2018 | Did not test appendages TB1, TB2, TB3 |
| 408 | 8/13/2018 | Did not test appendages TB1, TB2, TB3 |
| 461 | 9/28/2018 | Did not test appendages TB1, TB2, TB3 & areas 3, 7 |
| 513 | 1/3/2019 | Did not test appendages TB1, TB2, TB3 & areas 3, 7 |

70. Another example, ordered for Boeing for the AH-64E Apache, Part No. 7-511325010-001, testing was flawed as follows:

| Serial No | Testing Date | Issue |
|---|---|---|
| 0006 | 1/20/2015 | No test data for this casting |
| 0032 | 6/25/2015 | Did not test appendages TB1 & TB3 |
| 0052 | 6/25/2015 | Did not test appendage TB1 |
| 0072 | 7/23/2015 | Test area 2 tested as .252 round not .252 flat; did not test appendage TB1 |
| 0117 | 10/8/2015 | Test area 2 tested as .252 round not .252 flat |
| 0167 | 4/1/2016 | Test area 2 tested as .252 round not .252 flat; did not test appendage TB1 |
| 0220 | 7/12/2016 | Test areas 2 & 5 tested as .252 round not .252 flat; did not test appendage TB1 |
| 0317 | 11/15/2016 | Test area 2 tested as .252 round not .252 flat; did not test appendage TB1 |
| 0358 | 6/28/2017 | No test data for this casting |
| 0362 | 8/1/2017 | Did not test appendage TB1 or test area 5; test area 2 tested as .252 round not .252 flat |
| 0409 | 1/29/2018 | Test area 2 tested as .252 round not .252 flat; did not test appendage TB1 |
| 0456 | 6/12/2018 | Test areas 2 & 5 tested as .252 round not .252 flat; did not test appendages TB1, TB2, TB3 |
| 0518 | 1/8/2019 | Did not test appendages TB1, TB2, TB3 & test area 5; test area 2 tested as .252 round not .252 flat |
| 0569 | 3/19/2019 | Did not test appendages TB1, TB2, TB3 & test area 5; test area 2 tested as .252 round not .252 flat |
| 0614 | 9/12/2019 | Did not test appendages TB1, TB2, TB3 & test area 5; test area 2 tested as .252 round not .252 flat |
| 0676 | 3/4/2020 | Did not test area 5; test area 2 tested as .252 round not .252 flat |

Case 1:20-cv-00100-LTS-MAR   Document 1   Filed 10/09/20   Page 17 of 29

| Serial No | Testing Date | Issue |
| --- | --- | --- |
| 0728 | 6/8/2020 | Testing on this casting had not been completed at Relator's termination |
| 0777 | 8/5/2020 | Testing on this casting had not been completed at Relator's termination |
| 272 | 8/29/2016 | Test area 2 tested as .252 round not .252 flat; did not test appendage TB1 |

71. Another example, ordered for Boeing for the AH-64E Apache, Part No.

7-511325010-002, testing was flawed as follows:

| Serial No | Testing Date | Issue |
| --- | --- | --- |
| 0080 | 7/22/2015 | Did not test appendage TB1 |
| 0130 | 10/27/2015 | Did not test appendage TB1 |
| 0230 | 7/12/2016 | Test area 5 tested as .252 round not .252 flat; did not test appendage TB1 |
| 0266 | 8/9/2016 | No test results for test area 5, met report states it was outsourced to a 3rd party, Westmoreland Mechanical Testing & Research, Inc.; did not test appendages TB1, TB2, TB3 |
| 0318 | 9/19/2016 | Did not test appendage TB1 |
| 0366 | 3/2/2017 | Did not test appendage TB1 or test area 5 |
| 0414 | 8/18/2017 | Did not test appendages TB1,TB2,TB3 or test area 5 |
| 0516 | 8/9/2018 | Did not test appendages TB1,TB2,TB3 |
| 0561 | 1/11/2019 | Did not test appendages TB1,TB2,TB3 or test area 5 |
| 0614 | 6/17/2019 | Did not test appendages TB1,TB2,TB3 or test area 5 |
| 0659 | 11/5/2019 | Did not test appendage TB1 or test area 5 |
| 0712 | 6/8/2020 | Testing on this casting had not been completed at Relator's termination |
| 0759 | 8/11/2020 | Testing on this casting had not been completed at Relator's termination |
| 347 | 3/4/2015 | Did not test appendages TB2 & TB3 |

72.    Another example, ordered for Boeing for the AH-64E Apache, Part No.

7-511325012-001, testing was flawed as follows:

| Serial No | Testing Date | Issue |
|-----------|--------------|-------|
| 1 | 12/1/2014 | Did not test appendages TB1 & TB2 |
| 122 | 10/14/2015 | Did not test appendages TB1 & TB2 |
| 167 | 9/29/2015 | Did not test appendages TB1 & TB2 |
| 1046 | 7/18/2019 | Did not test appendages TB1 & TB2 |
| 0216 | 10/14/2015 | Did not test appendages TB1 & TB2 |
| 0412 | 6/9/2016 | Did not test appendage TB1 |
| 0906 | 10/31/2018 | Did not test appendages TB1 & TB2 |
| 0995 | 4/22/2019 | Did not test appendages TB1 & TB2 |
| 0995 | 7/18/2019 | Did not test appendages TB1 & TB2 |
| 1099 | 8/23/2019 | Did not test appendages TB1 & TB2 |
| 1200 | 5/28/2020 | Testing on this casting had not been completed at Relator's termination |
| 1248 | 5/28/2020 | Testing on this casting had not been completed at Relator's termination |
| 747 | 2/2/2018 | Did not test appendages TB1 & TB2 |
| 800 | 3/28/2018 | Did not test appendages TB1 & TB2 |

73.    Another example, ordered for Boeing for the AH-64E Apache, Part No.

7-511325018-001, testing was flawed as follows:

| Serial No | Testing Date | Issue |
|-----------|--------------|-------|
| 0001&0002 | 12/1/2014 | Did not test appendages TB1 & TB2 |
| 0003&0004 | 12/10/2015 | Did not test appendages TB1 & TB2 |
| 0007&0008 | 1/14/2015 | No testing data for this casting |
| 0147&0148 | 7/25/2015 | Did not test appendages TB1 & TB2 |
| 0214&0242 | 10/30/2015 | Did not test appendages TB1 & TB2 |
| 0647&0648 | 6/29/2017 | Did not test appendages TB1 & TB2 |
| 0739&0740 | 9/22/2017 | Did not test appendages TB1 & TB2 |
| 0753&0754 | 8/16/2017 | Did not test appendages TB1 & TB2 |
| 0917&0918 | 5/18/2018 | Did not test appendages TB1 & TB2 |
| 0975&0976 | 8/2/2018 | Did not test appendage TB1 |
| 1033&1034 | 10/1/2018 | Did not test appendages TB1 & TB2 |
| 1135&1136 | 2/1/2019 | Did not test appendages TB1 & TB2 |

| Serial No | Testing Date | Issue |
|---|---|---|
| 1213&1214 | 4/30/2019 | Did not test appendages TB1 & TB2 |
| 1429&1430 | 6/4/2020 | Testing on this casting had not been completed at Relator's termination |

74.     Another example, ordered for Bell for the V22 Osprey, Part No. 901-044-205-103C, testing was flawed as follows:

| Serial No | Testing Date | Issue |
|---|---|---|
| 581 | 2/18/2016 | Did not test area T1 - MET report falsified |
| 617 | 3/22/2017 | Did not test areas T8C, T9 - MET report falsified |
| 647 | 9/21/2017 | Did not test areas T8C, T9 - MET report falsified; appendages 2,3 tested as .252 round, not .505 |
| 655 | 5/22/2018 | Did not test areas T8C, T9 - MET report falsified |
| 700 | 5/9/2019 | Did not test area T8C - MET report falsified; test area 9 tested as .252 round, .252 flat |

75.     Another example, also for Bell, ordered for the V22 Osprey, Part No. 901-044-206-101C, testing was flawed as follows:

| Serial No. | Testing Date | Issue |
|---|---|---|
| 610 | 9/11/2017 | Did not test Areas T8C or T9 – Metallurgical Report falsified |
| 630 | 4/6/2018 | Did not test Areas T8C or T9 – Metallurgical Report falsified |
| 652 | 3/22/2019 | Did not test Areas T8C or T9 – Metallurgical Report falsified |

76.     Another example, also for Bell, ordered for the V22 Osprey, Part No. 901-044-210-105C, testing was flawed as follows:

| Serial No | Testing Date | Issue |
|---|---|---|
| 477 | 5/21/2019 | Did not test areas T6C, T9C, T13C, T14C |

77.    Another example, also for Bell, ordered for the V22 Osprey, Part No.

901-045-204-101C, testing was flawed as follows:

| Serial No | Testing Date | Issue |
|---|---|---|
| 575 | 12/29/2015 | Did not test area T1C; test area 4 tested as .252 round, not .252 flat |
| 604 | 7/29/2016 | Did not test areas T1C, T2C, T4 |
| 631 | 7/10/2017 | Did not test areas T1C, T2C, T4 |
| 692 | 2/19/2019 | Did not test areas T1C, T2C, T4 |
| 722 | 4/29/2020 | Test area 4 tested as .252 round, not .252 flat |

78.    Another example, also for Bell, ordered for the V22 Osprey, Part No.

901-045-225-101C, testing was flawed as follows:

| Serial No | Testing Date | Issue |
|---|---|---|
| 549 | 12/6/2016 | Did not do DT's for years - all flat bars |

79.    Another example, also for Bell, ordered for the V22 Osprey, Part No.

901-045-226-101C, testing was flawed as follows:

| Serial No | Testing Date | Issue |
|---|---|---|
| 543 | 5/23/2018 | Did not test area T4 or appendage 3; tested areas T1, T2, T3, T5 as .252 round, not .252 flat |
| 568 | 10/8/2016 | Did not test this casting at all |
| 621 | 5/25/2018 | Did not test appendages 2,3; tested areas T1, T2, T3, T4, T5 as .252 round, not .252 flat |
| 648 | 7/31/2019 | Did not test this casting at all, save for APP2 |

80.   Another example, also for Bell, ordered for the V22 Osprey, Part No. 901-045-229-101C, testing was flawed as follows:

| Serial No | Testing Date | Issue |
|---|---|---|
| 552 | 11/6/2014 | No test data for this casting at all |
| 691 | 5/15/2017 | Did not test areas T2, T8, T10, T11, T12, T13 |
| 742 | 8/6/2018 | Did not test areas T2, T8, T10, T11, T12, T13 |
| 803 | 1/13/2020 | Did not test areas T2, T8, T10, T11, T12, T13. Quality issues in our aluminum present. Large grain size and causing repeated test failures |

81.   Another example, also for Bell, ordered for the V22 Osprey, Part No. 901-045-230-101C, testing was flawed as follows:

| Serial No | Testing Date | Issue |
|---|---|---|
| 528 | 4/6/2015 | Did not test area T16 |
| 598 | 7/28/2016 | Did not test areas T1, T7C, T10, T11, T12, T13 |
| 625 | 6/15/2017 | Did not test areas T2, T10, T11, T12, T13; test area 7 tested as .252 round, not flat |
| 657 | 3/1/2018 | Did not test areas T2, T7C, T10, T11, T12, T13 |
| 687 | 9/21/2018 | Did not test areas T2, T7C, T10, T11, T12, T13 |
| 713 | 10/10/2019 | Did not test areas T2, T7C, T10, T11, T12, T13. At this point the aluminum started having quality issues, large grain size, leading to repeated test failures in areas we tested |

82. Another example, also for the Bell V22 Osprey, Part 901-045-287-101C, testing was flawed as follows:

| Serial No | Testing Date | Issue |
|---|---|---|
| 631 | 11/6/2017 | This casting was never tested, all flat bars |
| 659 | 5/21/2019 | This casting was never tested, all flat bars |

83. Another example, also for the Bell V22 Osprey, Part 901-045-288-101C, testing was flawed as follows:

| Serial No. | Testing Date | Issue |
|---|---|---|
| 496 | 10/27/2014 | No test data for this casting at all |
| 546 | 9/8/2016 | Appendage 3 was not tested |
| 620 | 7/19/2019 | This casting required flat specimens; never tested at all. |

84. Finally, with respect to destructive testing, Relator learned during the final week of his tenure in the Met Lab that the Lab should have been performing destructive testing on Part No. 06352-08004-001 and Part No. 06352-08003-001, and possibly on Part No. 06352-08102-001, as part of the Sikorsky CH-53K King Stallion contract. But during Relator's entire tenure, the only destructive testing done on any part for the CH-53K King Stallion was on the "bat wing," and that was only done sporadically.

85. These same parts were also supposed to be subjected to microstructure analysis for acceptance, but that was never done either. Metallurgist Nitzchke told Relator that "somebody in sales promised something that wasn't really feasible" because of the time that would be required to fulfill the

contract's requirements for microstructure analysis.

## Falsifying Reports Relating to Salt Fog Corrosion Testing

86.     Prior to 2013, all Salt Fog Corrosion Testing was performed by then-manager Mike Merboth.

87.     After Merboth was terminated in 2013 (two years before Relator moved into the Met Lab) no one in the Met Lab knew how to use the equipment to perform Salt Fog Corrosion Testing.

88.     When Relator started working in the Met Lab in 2015, he assumed that Salt Fog Corrosion Testing was not required, because the "coupons" for Salt Fog Corrosion Testing simply accumulated in boxes, which when full were moved into what was colloquially known as "Salt Fog Mountain."

89.     These coupons, which are four-by-four inch cards made from the same pot of metal as their parent castings, had been accumulating since Merboth's departure in 2013.

90.     In investigating the many issues he discovered after he found Arms falsifying data for the second time, Relator discovered that Salt Fog Corrosion Testing is in fact a requirement for many of the military contracts, and that each lot of castings that is poured together and heat-treated together must have at least one coupon tested.

91.     Rather than perform the testing, Wellman had simply been sending out an old certificate of passing.

92.     At the time of Relator's termination, under Hagen's leadership, Wellman was taking steps to start up that testing, and management was debating whether there was a need to catch up on prior years.

93.     Relator understood from Hagen that some customers, including Boeing Rotorcraft Systems, had started asking questions about the old documentation that had been sent.

**Falsifying Hot Isostatic Testing**

94.     Per protocol at the Met Lab, aluminum castings are to be sent to Bodycote for Hot Isostatic Testing (HIT). Bodycote then sends back cubes of the metal alongside the treated castings, which are then supposed to be polished so that microstructure analysis may be performed to prove the process was sufficient to stop oxides and intergranular attack in the casting. This is known as intergranular attack verification of hot isostatic test parts.

95.     In or about 2016, Relator noticed that although the metal cubes were still being sent from Bodycote alongside the casting, the Lab Manager was no longer performing the microstructure analysis.

96.     When he inquired, he was told that Bodycote was now performing the analysis.

97.     When Hagen took over as lab manager, he began performing the microstructure analysis himself, and told Relator that Bodycote had stopped performing the analysis.

98. Upon information and belief, Bodycote never performed the analyses post treatment.

**Retaliation Against Relator**

99. Although Relator was not immediately laid off after Arms's "promotion," the more he questioned Met Lab practices the more he was discouraged from further investigation.

100. Eventually, in August, just a little more than two months after he reported Arms's second round of falsifications, Relator was laid off.

101. Relator was told that it was part of a work force reduction relating to the 2020 global pandemic, but at that time, the Met Lab was understaffed and had an open position.

102. As of October 5, 2020, Relator has returned to work at Wellman in his former job of X-Ray Technician, at a pay cut.

**COUNT I**
**VIOLATIONS OF 31 U.S.C. § 3729–FEDERAL FCA**
**(All Defendants)**

103. Relator hereby incorporates and realleges herein all other paragraphs as if fully set forth herein.

104. As set forth above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

105.  As set forth above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false claims, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

106.  Due to Defendants' conduct, the United States Government has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim. 31 U.S.C. § 3729.

107.  Relator is entitled to reasonable attorneys' fees, costs, and expenses. 31 U.S.C. § 3730(d)(1).

## COUNT II
## VIOLATION OF 31 U.S.C. § 3730 – RETALIATION
## (Defendant WDC Acquisitions, LLC d/b/a Wellman Dynamics)

108.  Relator hereby incorporates and realleges herein all other paragraphs as if fully set forth herein.

109.  Defendant Wellman violated Relator Keller's rights pursuant to 31 U.S.C. § 3730(h) by retaliating against him for lawful acts done by him in furtherance an action under the federal False Claims Act and other efforts to stop one or more violations of the federal False Claims Act.

110.  As a result of Defendant Wellman's actions, Relator Keller has suffered damages in an amount to be shown at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against Defendants:

(a) awarding the United States treble damages sustained by them for each of the false claims;

(b) awarding the United States a maximum civil penalty for each of the false claims, records, and statements;

(c) awarding Relator the maximum share of the proceeds of this action and any alternate remedy or the settlement of any such claim;

(d) awarding Relator all relief available, including special damages, resulting from retaliation pursuant to 31 U.S.C. § 3730(h);

(e) awarding Relator litigation costs and reasonable attorneys' fees;

(f) granting such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Relator hereby respectfully demands trial by jury on all issues and counts triable as of right before a jury.

Respectfully submitted,

s/ Guy R. Cook
Guy R. Cook
Iowa Bar No. AT0001623
**Grefe & Sidney Law Firm**
500 East Court Avenue Suite 200
P.O Box 10434

Case 1:20-cv-00100-LTS-MAR   Document 1   Filed 10/09/20   Page 28 of 29

Des Moines, Iowa 50306
Telephone: (515) 245.4300
Facsimile: (515) 245.4452
gcook@grefesidney.com

Julie Bracker (*pro hac vice* applied for)
Georgia Bar No. 073803
**Bracker & Marcus LLC**
3225 Shallowford Road, Suite 1120
Marietta, Georgia 30062
Telephone: (770) 988-5035
Facsimile: (678) 648-5544
Julie@fcacounsel.com